We'll call the first case for the morning, which is Pennsylvania Employees Benefit Trust Fund v. Zeneca Inc. And as I await counsel for the appellants to come to the podium, I want to thank, again, as I did yesterday, Judge Gene Siler of the Sixth Circuit, who is gracing us with his presence this week, helping us enormously. Judge Siler is an old and dear friend of mine. I'm not old. Neither of us are old, Gene, but I've known him for about as long as I've been a federal judge, which has become perilously close to 20 years. He is one of the true workers of the federal judiciary, someone who, even as a senior judge in the Sixth Circuit, has carried a full workload quite often and has been out to help other circuits throughout the country. So, Judge Siler, we thank you. I know Judge Callum joins us. You're quite welcome. All right. Mr. Spiegel, I go forward for the appellants. Thank you, Your Honor, and good morning. May it please the Court, my name is Craig Spiegel. I'm representing the appellants today. I would request three minutes saved for rebuttal, if I may. Thank you. This case concerns our allegation of a broad-based national campaign directed from AstraZeneca's headquarters for the purpose of selling the prescription drug Nexium at an inflated price. The reason for this campaign was that the blockbuster drug Prilosec, which sold billions of dollars in the 1990s, was scheduled to go off patent in approximately 2001. As a result, it was highly likely that Prilosec would face generic competition sometime soon thereafter. So AstraZeneca worked to develop a new drug, and they came up with a drug they called Nexium. Nexium has one of the two isomers that are in the drug, Prilosec. AstraZeneca presented a new drug application to the FDA. Now, as I know the Court knows, in order to get a drug approved, all AstraZeneca has to show is that that drug is better than a placebo. But AstraZeneca chose to try to convince the FDA that Nexium is clinically superior to Prilosec. As we allege in detail in our complaint, however, the FDA found that Nexium is not clinically superior to Prilosec. Nonetheless... Well, the FDA never... correct me if I'm wrong... I'm not aware that the FDA ever, in their approval process, says that one drug is better than another. They normally do not. But in this case, they did reject the argument by AstraZeneca that Nexium is superior to Prilosec. Because AstraZeneca, in this process, presented some evidence about Nexium and Prilosec in comparison. And therefore, while the FDA normally does not have to say anything about it, because in this case, AstraZeneca chose to try to convince the FDA that Nexium is superior to Prilosec, the FDA responded and said, it's not. The FDA has a marketing section as well as an approval section. Well, it's really more the FTC, but there is the DDMAC. That is correct, Your Honor. That looks at marketing materials. Did this ever go to that section for its approval? There were certain ads, certain marketing materials that did go to the DDMAC. We don't talk about that in the complaint, but as I'll get into more detail later, a very important part of our case is that the oral conversations that the detailers, that is the salespeople, have with doctors don't go through any kind of approval process. I mean, the DDMAC can't approve what was actually said orally to physicians, and that's a major part of our case. So that part of what was said did not go and could not have gone to the DDMAC. Let me begin, for purposes of my areas of interest in any event, with the statutory exemption issue under the Delaware statute. There is in place a working agreement between the FDA and the FTC. Yes, Your Honor. Why should we not regard that working agreement as an effective delegation from the FDA, such as to trigger the exemption under the Delaware statute? Because no one is required to submit anything to the DDMAC. It is not a case where everything has to be submitted to the DDMAC, which then passes on whether that material passes muster. Therefore, essentially, unless I'm misunderstanding, Your Honor would be saying that that delegation would preempt any claim of false advertising, merely because there is the DDMAC present. And no court, to my knowledge, has ever held that. And in addition, we don't know what, in fact, is submitted to the DDMAC up front. And further, the DDMAC has nothing to say, as I mentioned earlier, about what is said in oral conversations between the detailers and the physicians. And as Your Honor knows from our complaint, we allege that AstraZeneca held a meeting of 6,000 salespeople in Hawaii for the purpose of telling them what they should say orally to physicians. And these detailers did go out and do just that. Now, we don't have them in this case, but in other cases we have call notes from AstraZeneca. I can't talk about the details, and I won't, because we obtained them at a marked confidential. But the point is, those detailing notes, those call notes, are out there to help us know what, in fact, was said orally to the physicians. And holding that the delegation or the agreement between the FDA and the FTC preempts all false advertising claims would let detailers say whatever they want in an oral conversation, and yet a claim of deception would be preempted, even though the agreement between the FTC and the FDA says it has no effect. How do you distinguish this case from Brockman in the Supreme Court? The fraud on the FDA? Fraud on the FDA. We are not alleging a fraud on the FDA at all. In fact, we are saying that the FDA agrees with what we are saying. In other words, the FDA said Nexium is not superior to Prolisac. So we are not claiming any kind of fraud on the FDA. What we're claiming is AstraZeneca presented studies to the FDA. The FDA came to the conclusion that those studies do not support a claim that Nexium is clinically superior to Prolisac, and that nonetheless AstraZeneca detailers went out and said exactly that to physicians. Wouldn't it be unreasonable for the court to conclude that if the Delaware legislature, with its Consumer Frauds Act, exempted that approved by the FDA, that if there was an approval or an implied approval by the FDA through the FTC, or vice versa, by the FTC through the FDA, that this would be a talents? I don't believe so, Your Honor, because the DDMAC is not the kind of process there that would allow for a preemption of all claims. And by that I mean it's not a rigorous process. The reason I believe that the courts hold that what the FDA says may go on a label preempts state law claims is precisely because the FDA goes into such rigorous depth. Mr. Speaker, I don't understand why your response to Judge Counten's question, and for that matter my previous question, isn't simply, the Delaware legislature said the FTC. They could have said the FDA. They could have selected a number of acronyms or alphabet soup variations, but they didn't. They chose one. Why doesn't the inquiry simply stop there? With the fact that, and I want to make sure I understand, and I understand what the statute says about the FTC, and is it your question, Your Honor, that therefore because the FTC is involved in it? My question is the plain language of the statute. Why are we talking about anything other than the reach of FTC regulation when that's all the statute says? In terms of the statute, Your Honor, Safe Harbor, I'm sorry, we are talking about it. Excuse me, I was also thinking there is the preemption argument they make, the broader argument. I apologize. On the Safe Harbor, yes, it is the FTC. That is correct. I'm sorry. Well, your friend across the aisle would say, yeah, the Delaware statute says the FTC, but the FTC and the FAA have a working agreement. Ergo, it makes only sense that if they said the FTC, they included anything that the FTC had a working agreement with. What's wrong with that thinking? Well, even if that were correct, the problem in this case is that the statute also says that what is alleged must have been specifically permitted. It doesn't say just because there's an FTC involvement. But the statute says it must be specifically, I'm sorry, I didn't follow that. Yes, that for a safe harbor, for there to be a safe harbor, the act must be specifically permitted. It's not just that there is regulation in the general field and therefore there's preemption. And in this case, what we're saying is that no one specifically permitted in any way. In fact, quite the opposite. They prohibited a claim that NXIVM is clinically superior to Prilosec. Let me ask something. If we agree with you, do you concede that at most you have a question of fact for a jury? This is not a question that we would resolve one way or the other or that a district court would resolve. I think that's right. There's a lot more material out there that would be relevant to this. So your basic position is if you prevail on this appeal, that there's a jury question if you are able to go to a jury on this case. As to whether or not this is in fact false advertising. Well, that's correct, Your Honor. We're not claiming at this point. Are you basing your false advertising on what was printed or on the news media? Are you basing it upon what the salesmen were saying? It's both, Your Honor. It was like we cited to the court the NRA warfare in case this court decided. And there the court talked about a broad-based national campaign. And that's what we're alleging. Part of that campaign was to convince consumers to either ask for NXIVM or, if it were offered, to take NXIVM as a drug. The main point at which we believe that those ads were deceptive is in saying that NXIVM is today's purple pill from the makers of Prilosec. They didn't say it was superior, did they? Explicitly? No. They just said it's the purple pill of the future. But under the Delaware Act, the question is whether a reasonable consumer would take away the impression that it's superior. And we believe that at this stage, at the pleading stage, that the court cannot say that no reasonable person could take away from the claim that NXIVM is today's purple pill from the makers of Prilosec or the new purple pill from the makers of Prilosec. A reasonable person could take away from that that Prilosec is inferior to NXIVM. Mr. Spiegel. Yes, Your Honor. Is there any claim that can be made based upon the Delaware statute against a drug company and based upon its advertising, other than a claim based on safety and efficacy of the drug? I don't know, Your Honor. In this case, our claim is it's based on the efficacy, the comparative efficacy. So, yes, we do. It can be there because just like in, I see my time's up. Just like in Warfarin, it wasn't, there was, it was a purely economic claim. And this court made that clear and said that with a purely economic claim, that reliance is not necessary and that, in fact, reliance is irrelevant to a finding of liability. And we're saying the same thing here. We're not claiming. I want to make sure, in case it isn't clear, we're not claiming that NXIVM harmed anyone. We're not making that kind of claim. What we're saying is it was sold at a much higher price than it would have been but for these misrepresentations. And that's very much the same as occurred in the NRA Warfarin case. We'll have you back on rebuttal, Mr. Steele. Thank you. Mr. Haddad. That's correct. Long day, short day. Haddad or Haddad? You got it exactly right, Your Honor. Well, that may be the only time of day, but thank you. Thank you. Thank you, Your Honor, and may it please the court, my name is Mark Haddad and I represent the appellees this morning. The FDA expressly permits manufacturers of prescription drugs to advertise those drugs in a manner that is supported by the FDA-approved labeling of those drugs. And the FDA does so because in the labeling, which is part of the new drug approval process, the FDA has found that all of the information in that labeling is supported by substantial evidence and is not false or misleading. But to cut to the chase, your adversary says that a fair implication, he says a reasonable person could conclude that your advertisement says, in effect, that it is superior to Nexium, is superior to Prilosec. And that was never approved, there was never any approval of that by the FDA. Your Honor, everything that the plaintiffs here say gives rise to that impression was specifically approved by the FDA as part of the labeling. What in the FDA process said that it was superior to this drug? That went over my head, if it's in the briefing or the record. Let me take it in two pieces, your Honor. First of all, virtually 98% of what they point to here, if not all of it, are benign statements such as today's purple pill, the new purple pill, the fact that Nexium is manufactured by the same manufacturer as Prilosec. All of these facts that they say give rise to this impression are inherently the facts on which AstraZeneca proceeded with the FDA to get approval for Nexium and to get approval to market Nexium, including down to the color of the capsule. So, in that sense, they are attacking not just simply a false statement or a false head, but they're attacking the entire marketing of this product. Well, let me ask you this. Do you concede or would you acknowledge that the FDA never said that this Nexium is better than Prilosec? I mean, is that a yes or no, or do you have to explain your answer? No, I can say the FDA never said those words in the labeling. There's no sentence that says it is better. Well, if that is true then, if they never say it's better, then would it follow that if sufficient other words were said from which a reasonable person could conclude, could infer from those words in their totality, that it is better that such a statement was never approved by the FDA? No, Your Honor, because the impression that is being alleged to be drawn here is the same impression that flows directly from the words and the facts that the FDA did approve. So, to go to the second part of the answer, I would say the Court should look at pages 283 to 285 of the Joint Appendix, which are the pages at which the FDA sets forth the studies and the results of the studies on the healing of erosive esophagitis and the treatment of the symptoms of erosive esophagitis. But they never said Nexium is better than Prilosec, did they? That is true in that section they don't say that. However, what they do is they set forth the results of the studies that supported the approval of a 40 mg dose of Nexium for the healing and the treatment of the symptoms of erosive esophagitis. And that is something that they did not do for Prilosec. If you would have said in so many words that Nexium is better than Prilosec, if you would have said that, would you acknowledge that that would be a violation? You'd have to look at the context in which we said that, Your Honor. It would be contextualized. Because if it was understood that we were saying that in light, for example, of the better healing effectiveness of the 40 mg dose of Nexium over a 20 mg dose of Prilosec, the fact that it cures, gives full relief of the symptoms in on average five days as opposed to seven to nine days of Prilosec, then it's quite clear that that's supported by the labeling. Did you ever say that? That the sales representative is directing the doctor to the data on the healing studies comparing Nexium to Prilosec. And those are the very studies that the FDA looked at, concluded were not falsely misleading. But the FDA never concluded that Nexium was better. They never said that in so many words, did they? That's true. They didn't say that in so many words. So if you say it inferentially, you can't conclude that it would be FDA approved, would you? Not if we say it, if the inference flows from the very same things that the FDA said we could say. I think that is the critical part of this answer. If we, for example, point to the data that supported a 40 mg approval for the healing of erosive esophagitis, that is very significant because the FDA did not approve a 40 mg dose for other indications. It didn't approve it, for example, for the maintenance of healing of EE. And if you look again in the labeling, you will see that the FDA explains we didn't approve 40 mg for the maintenance of the healing of EE because 40 mg wasn't more effective than 20. So when they approve a higher dose, it's because they have found substantial evidence to support the increased effectiveness that goes with that dose. Well, effectiveness and therefore salability. But as a matter of policy, the FDA does not rate one drug against another drug. They approve drugs, but they do not have a rating system of one drug vis-a-vis another drug. Not to my knowledge. If the inference can be drawn reasonably that what you're saying is in effect that the FDA has concluded that Nexium is better than Prilosec, you are attributing to the FDA something which they never in express words uttered. But we rely on the regulatory scheme, Your Honor, which allows us to make comparative claims when they are supported by substantial evidence. But if a reasonable jury can conclude that you made these claims that Nexium is superior to Prilosec, why wouldn't that spell a cause of action under the Consumer Act? Since according to what you said yourself, the FDA never said that Nexium is superior to Prilosec. The FDA doesn't have to use those words to allow us to make the statements that we made. Remember that we don't have these abstract statements of superiority. What we're being challenged on are statements that are directly supported by the labeling. And here I think it would be helpful if I were to point the Court to the regulatory framework specifically that permits us to do what we did. Would that be an argument more appropriately addressed to a jury instead of an appellate court? Absolutely not, Your Honor. We think it's critical that this Court address this regulatory framework because the FDA has set forward by law a framework under which manufacturers operate and are permitted expressly to operate and sell the products they sell. Prescription drugs are unlike almost any other product in that they are never sold. They are never marketed at all unless they survive the FDA review process. And it's a two-part regulatory framework that's critical for the Court to appreciate here. The first part is the labeling and the regs there that I would particularly ask the Court to focus on are 21 CFR 314.125 subparts B5 and 6. Because those are the regs that say that the FDA's labeling is not going to be approved unless it's supported by substantial evidence and is not false or misleading. Can I just dovetail onto one of my colleagues, Judge Smith's question? The Act says FTC, pure and simple. It doesn't say FDA. That's right. Your colleague across the aisle argued that the plain meaning of the statute should be followed and the FDA is not involved in this dispute. It was never approved by the FTC. Why is that the end of the argument? For essentially the reasons that you attributed me during the questioning of Mr. Spiegel, it seems clear to us that what the Delaware legislature said here is we're deferring to the FTC here. If it's good enough for the FTC, if it simply is subject to FTC rules and it complies with them, then Delaware is not in the business of second-guessing whether there's a consumer product problem. Now the FTC has in a written agreement said the experts here are the FDA and they're the ones we're going to delegate to. But it is so obvious it's probably not to be worth my wasting your argument time, but the Delaware legislature didn't say that. They didn't say what you're saying right now. True, Your Honor, and I don't know that we have to belabor this either, but to us it seems fairly straightforward that if the Delaware legislature is going to defer in every other respect to the FTC, we can't see why they would not defer to this judgment of the FTC that if you're in full compliance with the FDA, then there's not a further enforcement issue under the FTC. And it makes sense because prescription drug advertising is not something that consumers act on directly. It goes through a learned intermediary. And this really takes us back to the second part of the regulatory structure that I wanted to point out, which is at 21 CFR 202.1. The working agreement? No, this is not the working agreement. 202.1 is very important because those are the regs that govern the advertising of prescription drugs. And it's an extraordinarily detailed set of regulations. And the court will see looking through them, they are all built around the labeling. And the one reg in this welter of regs that many of which are important, but that I can call the court's attention to specifically here this morning, is that 202.1 E6 Roman 2, little 2, because there the FDA has expressly permitted comparative advertising between drugs. So long as it is supported by either substantial evidence or by substantial clinical experience. Well, we know from the labeling rules that substantial evidence needs to support all of the studies that are on the labeling before they will get on the labeling. So we know that we have substantial evidence for the fair, not misleading comparisons between 40 milligrams of Nexium and 20 milligrams of Prilosec. And the FDA is saying in 202.1 E6.2 that that is permissible then to do the comparative advertising. So we don't. Yes, sir. For purposes of the preemption issue, I'd like to ask you the same question that I ask people. And that is, under the Delaware statute, is there any claim that could be made against a drug company based on the company's advertising other than a claim that's based on the safety and efficacy? Well, no such claim has been made here, of course. And but I suppose there could be other kinds of claims that would be made. You know, there could be a claim that it was advertised at a certain it's hard to see in a prescription drug context. But you can imagine that over-the-counter drug was advertised at a certain price. It wasn't sold at that price or available at that price or something like that. You could see going outside safety and efficacy. But, you know, really, our argument is a fairly narrow one. But it's critically important as a legal argument and as an appellate court argument. And at the preemption level, it is this, that federal law through the regulations that we've cited has said to manufacturers, yes, if you survive the new drug approval process, if we approve your labeling as supported by substantial evidence and not false or misleading, then you can rely on that. And if that's the foundation of your advertising, it is permitted. That's what we allow you to do. And I would like to correct a couple of the statements this morning along those lines. If you look at our brief at page 20, you'll find the site to the regulation where all of the ads that are done by a manufacturing company at the time of first use are submitted to the FDA's Division of Drug Marketing and Advertising and Communications, DDMAC. So it is a comprehensive regulatory scheme. And the upshot of it is really the analogy there is to Geier, the Geier versus Honda case, because there the federal agency said car manufacturers can choose to put airbags in their cars all at once or they can choose to use other kinds of passive restraints. And state law came in and said, no, we think airbags have to be in every car. And the Supreme Court said, that conflicts, that's an interference with the federal scheme. And the same thing is true here, where we are at. Yes, it's conflict preemption. You're arguing conflict preemption. Exactly. The state law is being invoked here to say that we can't do something that the federal framework has been set up to allow us to do, and that is to market as supported by our labeling. And so if you look at the advertising that is challenged here, the advertising that markets us as a new pill that gives rise to these inferences of being better than the old pill and so on, all of that is what we were and are permitted to do by the FDA as a result of this process. And all that we're asking to have happen here is essentially what Judge Wilson did in the recent Adamson case. It's what the Seventh Circuit did essentially in the Boker case. You look at what's being challenged, and if it's supported by the labeling, then state law can't come in and hold it to be unlawful. I would like to, I know my time is run, but if I had time to just talk briefly about the detailing. Very briefly. I would just say there that beyond the allegations in paragraph 88, the plaintiffs have only made very generalized statements about what they could prove. Again, those statements are not sufficient for Rule 9b. Well, that's the question. 9b, this is not a fraud case. Consumer fraud acts are not counter-law fraud type cases. Why would 9b be implicated in the law? It's directly implicated, Your Honor, because it's the heart. If you think back even how Mr. Spiegel introduced the argument this morning, he said this was a broad-based campaign directed from the headquarters. It's designed to mislead doctors about the truth about the product. Yeah, but under that Delaware Act, they don't have to prove intent under consumer fraud. All I have to prove is that it was misleading. But they have pleaded the case as if it were an intent case. And under FDIC v. Batcave and other decisions, where you plead it as a fraud case, it's not. Well, they plead it under the Act. And you can say that consumer fraud is an Act, yeah, but they didn't plead common law fraud. Even under Rule 8, Your Honor, and I'll close with this, we think that under the Bell Atlantic v. Quamley case, what they have pleaded is equally consistent with lawful conduct as it is with their allegations of unlawful conduct. When all they say is representatives said things were superior, that could mean... The district court never reached that issue, did it? The district court never reached it. Didn't need to because it squarely found that all of this was directly supported by the labeling. If we disagree with you on your position, should we reach it or should we remand it for resolution by the district court? I think you could reach it, Your Honor. I think it's pretty straightforward. The court can make its own prudential judgment there, but we think we've laid out the core legal issue, which should get resolved at this stage. And the core legal issue under Rule 8 is simply where you have generic statements or allegations of, well, the representatives said something was superior. We know from Bell Atlantic v. Quamley that that's not sufficient because that could mean that the representatives were calling it the new purple pill and were pointing out that it has greater effectiveness for healing ED at 40 milligrams dosage. In other words, every specific example in this complaint of alleged superiority is fundamentally supported under law. So if they just have vague allegations, those don't get them any farther than it got Quamley in the Bell Atlantic case where his allegations of conspiracy were equally consistent with independent action. Thank you very much, Mr. Henry. Mr. Spiegel, rebuttal. Thank you, Your Honor. If I may very quickly, I know normally one has to give notice of a new case, but the Supreme Court decided a new case yesterday under Rule 8 that the court may want to look at called, may well have already, excuse me, called Erickson v. Pardis. I don't think Quamley has created some new set of laws that needs to, that changes the legal landscape. There are two points I would like to make. First of all, on the DDMAC, the FTC's involvement in this. One thing that's not before the court is what the DDMAC found when AstraZeneca presented some of their ads. And so just the mere fact that the DDMAC is involved doesn't tell you whether an ad was submitted to the DDMAC. It doesn't tell anyone what the DDMAC said. It doesn't tell the court whether AstraZeneca complied with the FTC requirements to submit advertisements. So I don't think it's possible in the pleading, at the pleading stage, to say that even if what the FTC does, what the DDMAC does, matters in terms of safe harbor, it's not possible on this record to say what was done, what was submitted, what was said, what isn't submitted, such as the detailing statements by the detailers, the thousands of detailers that went out to the marketplace and touted Nexium. The only other point I'd like to make in this rebuttal is that counsel pointed the court to the label. Well, I think it's very important to note that there were four types of tests referenced on the label. On two of the tests, maintenance of healing of erosive esophagitis and H. pylori, there was nothing said about Prilosec. On another one, a third type of study, GERD, gastroesophageal reflux disease, easy for me to say, it actually says that there were three European studies which showed there were no differences between 40 mg of Nexium and 20 mg of Prilosec, or 20 mg of Nexium and 20 mg of Prilosec. So only with respect to one of the four types of studies in the label is there anything that can even remotely be interpreted as showing that Nexium, in a particular circumstance, depending on dosage, and relating to a particular matter, the healing of erosive esophagitis, that there are two studies that show a clinical difference and two studies that show there isn't. The reason I'm saying this is that what we are alleging is that in their detailing and in their other advertising, Nexium is, AstraZeneca states that Nexium is clinically superior to Prilosec, period. And counsel acknowledged that context matters. If all, anything a detailer said was to walk in and say, here's the label, here's everything on it, there are two tests that show this, two tests that show that, and walked out, we don't have a claim. But that's not what we're alleging. We are alleging that, in fact, they went in and said, Nexium is clinically superior to Prilosec, period. And if there are no questions, I see my time is up, and I'll step down. Thank you very much, Mr. Spiegel. Thank you. And thank you to both of the counsel for very helpful arguments in this exquisitely interesting case. We're going to take a very brief recess, about five minutes. We'll be right back. Thank you for your patience and recess. Court is now in session.